## FORT v. GOODWIN.

1. PRIVATE PROPERTY—EMINENT DOMAIN.—Under the Constitution of this State, private property is held sacred, and all laws must bear equally on all citizens—at least upon all of the same class in the same locality—subject only to the right of eminent domain in the State.

2. IBID.—IBID.—ELECTIONS.—An act of the legislature cannot authorize land to be taken for the building of a fence to enclose a pasture in a section of a county for the supposed benefit of those persons who own land within the pasture limits—certainly not without the consent of the owners or unless a just compensation be made therefor, even though the pasture be so determined upon by a vote of two-thirds of the freehold voters residing within those limits at an election held for the purpose under statutory authority.

3. IBID.—IBID.—The grant by the legislature of the right of way and necessary timber for this fence in the same manner as the law provides a right of way for railroad companies is insufficient, for it fails to provide for proper compensation; and, moreover, the compensation, if provided for by taxation, would, under the terms of this statute, fall upon the very persons whose lands are taken—persons living within the pasture limits.

4. IBID.—IBID.—DELEGATION.—It is doubtful whether the State can delegate its right of eminent domain to a county, but certainly the grant must be clear and compensation provided for, or else the legislature will be assumed to have intended only to confer a right on first obtaining the consent of those affected.

Before KERSHAW, J., Lexington, January, 1891.

This was an action by James C. Fort, as administrator *de bonis non* of William Fort, against G. A. Goodwin and others, county commissioners of Lexington County. The opinion states the case. The affidavit of L. S. Hooker was as follows:

Personally appeared before me L. S. Hooker, who, being duly sworn, says: That he was one of the managers of the election at Thomas Craft's mill on the first day of April last; that fifty-five votes were cast in said election—44 for "fence" and 11 for "no fence," and that the persons voting in said election were not required to hold up their right hand and take an oath. That Jacob Leard was the only person who held up his hand and took an oath to the best of his recollection, and that the said Jacob Leard voted for "no fence." That the deponent truly believes that nine-tenths of the owners of the land, or the persons who own nine-tenths of the land within the proposed boundaries sought to be exempted from the operations of the stock law, are opposed to "fence," as it will injure their lands and premises by subjecting it to be pastured on by every person who owns stock or cattle. and therefore the owners of the land would be deprived of the free and full use and occupation of the same, and consequently if the lands and premises are to be fenced off, it will be an irreparable injury to the land owners residing within the proposed boundaries sought to be exempted from the operation of the stock law, as the whole purport and intent of the act of the legislature is to make a public pasture for private persons to pasture their cattle and stock upon. That the most of persons residing within the proposed boundaries of the territory sought to be exempted as aforesaid, do not own any real estate, but do own some stock, and they desire to pasture their stock on the lands and premises of the land owners living within the proposed boundaries aforesaid. That deponent is advised and truly believes that persons who reside outside and beyond the limits of the proposed boundaries aforesaid will be allowed to pasture their stock on the territory sought to be exempted as aforesaid should said boundary fence be built. That if the said fence is built, the land owners within said boundary fence would be unable to recover any damages for the use and occupation of their lands and premises by cattle and stock, and consequently they would suffer an irreparable injury.

That the ballots cast in the election at the time and place aforesaid were not in accordance with the law in this: that the said ballots were not of the size, length, and width specified by law,

but when a voter presented himself, he picked up a piece of paper of irregular shape—sometimes tearing it off of a sheet of paper—and voted it in the ballot box.    That J. T. Craft and J. C. Howell, two of the managers of said election, were not sworn, as deponent knows of his own knowledge.

*Mr. C. M. Efird*, for appellant.

*Mr. G. T. Graham*, contra.

September 7, 1892.    The opinion of the court was delivered by Mr. Justice McGowan.[1]    The general stock law prohibited all owners of stock from allowing their stock to roam at large, outside of their own land, on pain of being liable to pay damages to persons upon whose lands the roaming stock may trespass.    From the passage of that act down to the present time, successive efforts have been made to exempt from the operation of that law a large portion of Lexington County, described rather vaguely, but in all said to contain about 150 square miles, and known as the "Big Pasture."    There have been so many acts and amendments on the subject, that, in order to prevent confusion, it will be necessary, in the first place, to ascertain clearly how the matter of legislation now stands.

The act of 1887 purports to be only an amendment, but as it repeals all former acts inconsistent with it, we will not attempt to go behind it.    That act (1887, 19 Stat., 1057) provides as follows: "That all that portion of Lexington County known as the 'Big Pasture,' embracing portions of certain townships [naming them] as is now fenced off in a common pasture, be, and the same is hereby, exempt from the operation of the provisions of chapter XXVII. of the General Statutes relating to the stock law, so long as the fences around said section are kept in good and substantial condition, sufficient to hinder the escape of stock therefrom," &c.    Section 3 exempts another portion of Lexington, but it was repealed by the act of 1889, to which we will refer hereafter.    "Section 4. That it shall be the duty of the

---

[1] This case was heard November 25, 1891, when the court consisted only of Justices McIver and McGowan.—REPORTER.

county commissioners of Lexington County to keep said fences around all the exempted portions as aforesaid in general repair; and to this end they are hereby authorized and required, from time to time, at the time of making their tax levy, to cause to be levied upon all cattle, hogs, sheep, and goats within the above exempted portions, a sufficient tax for repairing said fences, which tax shall be collected in the same manner and at the same time that State and county taxes are collected: Provided, that for the building, rebuilding, and repairing said fences, the right of way and all necessary timber shall be obtained in the same manner as is now obtained by railroad companies duly chartered, &c., and provided further, that nothing contained in this act shall be so construed as to make the County of Lexington liable for damages," &c.

The act of 1889 (20 Stat., 528), section 3, provides: "That all that portion of said county lying within the following boundaries [describing them], containing about 75 square miles, be, and the same is hereby, exempted, &c., &c. Provided, that the residents of the portion named as aforesaid shall build a fence along the lines described, exempted as aforesaid, sufficiently strong and close to protect the land outside of said pasture from the incursion of all stock and animals named in the general stock law. Provided further, that said change shall not go into operation or be effectual until the following conditions be complied with. That is to say, until the question of said change shall be determined by a vote of the freeholders living within the lines aforesaid, at an election to be held for that purpose; and further, that said change shall only take place after said election, and when it shall be ascertained by the same that two-thirds of the freeholders living within the boundaries of the proposed additional territory to be exempted as aforesaid, shall have voted therefor. * * * Said election shall be conducted after the manner of general elections within this State; return to be made to the county commissioners, who shall appoint the managers to conduct the said election. Upon the ballots to be used shall be written the words 'fence' or 'no fence;' and if it shall appear upon counting the same, that two-thirds majority of the said ballots are for 'fence,' then the

provisions of this amendment shall be effected and go into operation," &c.

These are the acts which we are to consider. It will be observed that none of these provisions make any reference to an election by the freeholders of the section to be exempted, except the act of 1889, section 3. The purpose of that act was not to exempt any portion of the "Big Pasture" proper, but of "additional territory," indicating the outside boundary line, and supposed to contain about 45 square miles. We rather incline to think it was the intention of this act to limit the provision as to an election to the territory therein considered. The words are, "when two-thirds of the freeholders living within the boundaries of the proposed additional territory to be exempted as aforesaid, shall have voted therefor," &c. But it seems that the county commissioners of Lexington construed the provision (1889) as applying to all portions of the county exempted previous to the passage of that act, including the "Big Pasture" proper. An election was ordered, which should have been conducted after the manner of general elections in the State; which, however, seems to have been conducted very irregularly; but the managers having returned that 55 votes were cast—44 for "fence" and 11 for "no fence"—the commissioners were about to commence proceedings for the right of way and timber under the act of 1887, unless restrained from so doing.

It appears that one of the lines of the "Big Pasture" must run through and divide into two parcels a large tract of land (6,000 acres) lately belonging to William Fort, deceased, and now in the care of James C. Fort, the plaintiff, who instituted this proceeding, seeking to enjoin the further proceedings of the defendants to establish said pasture upon various grounds, which are all stated in the complaint; and among others especially, that the acts of the legislature relied upon to authorize the proceedings are unconstitutional and void, *first*, because the manifest purpose of these acts is to create and establish a public pasture for private individuals to pasture their stock and cattle upon; and that payment for the right of way to run the fence of the proposed boundary would be no compensation for the use of his lands and premises mentioned and described in the complaint; and there would be

29—36

no way by which the land owners could recover damages for the use and occupation of same by stock and cattle; that is to say, that land owners could not recover damages out of persons pasturing their stock and cattle upon said lands and premises, and that the land owners residing within the proposed boundaries aforesaid would be deprived of the free use and occupation of their lands and premises.

There was no verbal testimony, but documentary evidence and some affidavits were offered, only one of which need be stated. It is that of L. S. Hooker, who was one of the managers of the election before referred to (and it should appear in the report of the case). The following statement of facts was agreed upon and submitted to the Circuit Judge at the trial: "*First*. That the act of 1886, being the original act creating an exemption from the general stock law of chapter XXVII., General Statutes of South Carolina, in connection with section 3 of the amendatory act of 1887, affecting certain portions of Lexington County, has never been carried out, in that the residents within the exempted portions have never built the fence as required of them under said act of 1887, they having built portions thereof, but in several instances failing to connect said portions built and the spaces so left open, varying in lengths. *Second*. That this fence never having been completed so as to prevent the escape of stock from the intended exemption, the county commissioners considered that the law had not been complied with by the people, and that they had no jurisdiction in the premises, and that they had no right to levy the tax and make the repairs as required of them under section 4 of the act of 1887; and that the county commissioners have in no wise taken jurisdiction under either of the acts in relation to said exemption, except in that they ordered the election under the act of 1889. * * * It is further agreed that any constitutional question raised by either side should be fully heard, even if not raised in the pleadings." This was agreed to by the defendants, with the qualification, that, so far as known, the "fence" was not completed in one small space.

The cause was heard by his honor, Judge Kershaw, who held as follows: "The plaintiff, on behalf of the estate he represents, situated within said section (proposed to be exempt from the oper-

ation of the stock law), owning about six thousand acres of land, now in plaintiff's possession, has commenced this action to enjoin the further proceedings of the defendants to establish said pasture. There are several grounds upon which they ask the injunction, the gravest of which is, that the object of the acts, and what the defendants propose to do, is to establish a public pasture in and upon the lands of the freeholders residing within the proposed boundaries *without any just compensation therefor.* An examination of the acts does show that there are no provisions contained therein for the compensation of the proprietors for the establishment of said pasture on their lands. These acts are, therefore, in this respect, fairly repugnant to the provisions of our State Constitution, which expressly limits the rights of eminent domain by the provision, that in all cases of its exercise in derogation of the property rights of the citizen, a just compensation shall be first made to the owner." And therefore he "adjudged and ordered that the defendants, their agents and servants, are hereby enjoined and forbidden to proceed in any manner in the establishment of said pasture until the further order of this court."

From this decree the defendants appeal to this court upon the following exceptions: "*First.* Because, it is respectfully submitted, that his honor erred in not holding that the acts of 1886, 1887, and 1889, referred to therein, did make ample provision and remedies for the payment to plaintiff of any damage or loss he might sustain by reason of the 'Big Pasture fence' being located on the lands in his possession. *Second.* Because, it is respectfully submitted, that his honor erred in holding that the said acts are repugnant to the express provisions of the Constitutions, both State and Federal."

The constitutional principles involved in this case are important to every citizen, and, therefore, the court was not surprised when the discussion here took a very wide range, and the counsel agreed that technicalities should not stand in the way of a full hearing. But from the view we take, it will not be necessary to follow the interesting argument through all the points made, or even to go beyond the grounds upon which the Circuit Judge placed his decision. As we understand it, private property is held as sacred under our Constitution, which re-

quires that all laws must be made to bear equally on all citizens—
at least upon all of the same class within the same locality. "Those
who make the laws are to govern by promulgated established laws;
not to be varied in particular cases, but to have one rule for rich
and poor, for the favorite at court and the countryman at plow."
*Utsey* v. *Hiott*, 30 S. C., 367. The only qualification to this
principle is, that every one holds his property subject to the
right of eminent domain in the State, which is well described as
follows: "Eminent domain is that sovereign power vested in the
people, by which they can, for any public purpose, take posses-
sion of the property of any individual, *upon just compensation
paid to him.* * * * Although it is a sovereign power vested in
a State, it cannot be exercised *unconditionally.* It can only be
exercised when the property is taken for a public use, and when
the property condemned is *necessary* to enable the public use to
be carried into effect. *It is also a condition, that compensation
must be made to the owner.* It is generally held that payment
of the compensation, or provision made therefor, is *a condition
precedent* to the right to enter upon and take possession of the
property taken." See 6 Am. & Eng. Encycl. L., and numerous
cases in the notes.

The acts in question propose, through the exercise of the right
of eminent domain, to make a public pasture on the lands of the
plaintiff and other freeholders living within the proposed
enclosure, and in order to accomplish that purpose, they
authorize the occupation of so much land as may be neces-
sary for the building of the enclosure fence. It seems to us that
this would be a "taking" of private property in the sense of the
Constitution, and without even indicating, with any degree of
clearness, for what purpose it is to be taken. It may possibly be
inferred that it is for the benefit of those whose business it is to
raise stock; for it manifestly increases the burdens of the free-
holders within the enclosure, who make objection that their lands
are to be turned into a public pasture, that they are to be taxed
to keep up the pasture fence, and required to fence any portion
of their own lands which they may wish to cultivate. As we
think, the legislature cannot accomplish such purpose for several
reasons—certainly it cannot be done without the consent of the

owners, "*or a just compensation be made therefor.*"  "The right to appropriate property includes not only the tangible thing owned, but every right and incident which accompanies ownership.  In the case of land, it includes any right of easement, and it has been held that it even includes the right of action for injuries to land," &c.   See 6 Am. & Eng. Encycl. L., 530.

We can hardly think that there is any force in the election ordered to be held by those living within the boundaries of the proposed enclosure.  That election was very irregular, and in several respects not in conformity to the law.  See the affidavit of manager, L. S. Hooker.  But if it had been otherwise, we cannot say that it would have changed the result.  The principal object of several of the restrictions in the Constitution was to protect the rights of individuals and of minorities.

But it is argued that section 4 of the act of 1887 does make ample provision for compensation to the freeholders.  If we understand it, the provision relied on is as follows :  "Provided, that for the purpose of building, rebuilding, and repairing the fence, the right of way and all necessary timber shall be obtained in the same manner as it is now obtained by railroad companies duly chartered."  There is certainly no express provision here, or in any of the acts, *for compensation.*  But, as we suppose, the claim is, that the right to compensation is given *impliedly* in the words, "*in the same manner as it is now obtained by railroad companies.*"  This refers specially to the manner of obtaining the right of way, and not to the *payment of compensation.*  We can discover no analogy between this case and that of a chartered railroad company.  The latter is a corporation, a legal entity, which usually condemns land for the right of way, but pays for both that and the timber necessary to build the road.  It is certainly out of the usual course to call into existence the great power of eminent domain to condemn the right of way and timber to build a pasture fence.  Besides. if provision in terms were made as compensation for establishing the Big Pasture, we are unable to see how it could be carried out, for who would pay it or become responsible for it?  Certainly not those outside of the enclosure, nor the freeholders inside of the enclosure, for they claim to be the sufferers, and en-

titled to *receive* rather than *to pay* the compensation. No responsible party appears for whose benefit the power is invoked, and by whom the compensation required should be paid. It will be observed how carefully the act of 1887 provides "that nothing contained therein shall be so construed as to make *the County of Lexington* liable for damages."

There are no adjudicated cases holding that the right of eminent domain can be delegated to individuals or private persons, although there is a line of decisions which may be thought to favor such a doctrine, and it is believed that there can be no such delegation. However, if individuals can in any instance exercise the power of eminent domain, it will be under the same conditions, and with the same limitations, imposed upon corporations. "But where any act seems to confer an authority on another to take property, but the grant is *not clear and explicit*, and no compensation is provided for by it for the owner or party whose rights are injuriously affected, the law will conclude that it was not the *intent* of the legislature to delegate the power of eminent domain, but simply to confer a right to do the act and exercise the power given *on first obtaining the consent of those affected*." 6 Am. & Eng. Encycl. L., 517, and notes.

We agree with the Circuit Judge, when he said that "as early as the case of *Bowman* v. *Middleton* (1 Bay, 250), it has been held in this State that such acts are void, 'because contrary to natural right and the fundamental principles of our government.'"

The judgment of this court is, that the judgment of the Circuit Court be affirmed.